**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**WILLIAM LEE THOMPSON,**

Plaintiff,

v.

**RICHARD D. COMERFORD, in his official capacity as Secretary of the Florida Department of Corrections; RANDALL L. POLK, in his official capacity as Warden of Florida State Prison, RON DESANTIS, in his official capacity as Governor of Florida; JAMES UTHMEIER, in his official capacity as Attorney General of Florida; CENTURION OF FLORIDA, LLC, a Florida limited liability company; CENTURION HEALTH SERVICES, LLC, a Florida limited liability company; ANGEL C. ACEVEDO, MD, an individual; JOSHUA BROWN, RN, an individual; DEENA CRAWFORD, RN, an individual; SELENA CROFT, RN, an individual; YAZZEL TORRES, RN, an individual; AMBER OSORIO, APRN, an individual,**

Defendants.

**Case No. 3:26-cv-2574**

**DEATH-PENALTY CASE**
**EXECUTION SCHEDULED**
**OCTOBER 13, 2026, AT 6:00 P.M.**

**EMERGENCY FILING**

# PLAINTIFF'S *EX PARTE* EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65 and Local Rules 3.01(f) and 6.01, Plaintiff William Lee Thompson, by and through undersigned counsel, moves the Court for entry of an emergency temporary restraining order ("**TRO**") barring Defendants from denying Mr. Thompson adequate medical care and, therefore, requiring Defendants to relocate Mr. Thompson to a medical facility (either within FDOC or at an outside hospital) that can provide him with adequate medical care.[1] After a hearing, Mr. Thompson further requests a preliminary injunction. Due to the exigency of Mr. Thompson's condition and the immediacy of the relief requested, a ruling is requested as quickly as possible.

## INTRODUCTION AND REASON FOR EMERGENCY RELIEF

Mr. Thompson is a 74-year-old man on Florida's death row with several severe medical conditions that require ongoing care and monitoring, including without limitation sepsis, heart failure, liver disease, kidney disease, a colostomy appliance, and an end-stage sacral ulcer. (*See generally* Ouaou Aff.; Zivot Aff.; Howard Aff.; Benner Aff.; Lacy Aff.)[2] FDOC was housing Mr.

---

[1] Unless otherwise noted, all capitalized terms have the same meaning as in Mr. Thompson's Complaint (ECF No.1).

[2] A true and correct copy of the death warrant Gov. DeSantis issued for Mr. Thompson is attached as **Exhibit 1**. A true and correct copy of the Affidavit of Robert H. Ouaou, Ph.D is attached as **Exhibit 2** and cited as "Ouaou Aff." A true and correct copy of the Affidavit of Joel Zivot, M.D. in support of All Writs Petition for Transport to Hospital is attached as **Exhibit 3** and cited as "Zivot Aff." A true and correct copy of the Affidavit of Charles Howard, MD, MMM is

Thompson in the infirmary at Union Correctional Institution ("**UCI**") until Gov. DeSantis signed his death warrant on September 11. (Ex. 1.) At that point, Defendants *removed* Mr. Thompson from the infirmary at UCI and transferred him to death watch at Florida State Prison ("**FSP**"), where he is currently housed without adequate medical care.

Since the Governor signed his death warrant, Defendants have shown a deliberate indifference to Mr. Thompson's medical condition. Defendants' ongoing denial of adequate medical care to Mr. Thompson is currently subjecting and will continue to subject him to extreme pain and suffering—as verified in the affidavits attached to this Motion. (*See generally* Ouaou Aff.; Zivot Aff.; Howard Aff.; Benner Aff.; Lacy Aff.) Therefore, Mr. Thompson faces imminent, irreparable harm and cannot wait for Defendants to respond to this Motion. *See* Fed. R. Civ. P. 65(b)(1)(A). Considering the exigent circumstances and the serious nature of Mr. Thompson's medical conditions, a ruling is requested as quickly as possible.

## FACTUAL BACKGROUND

### I. Mr. Thompson's Current Medical Condition

attached as **Exhibit 4** and cited as "Howard Aff." A true and correct copy of the Affidavit of Alisha Benner, MD is attached as **Exhibit 5** and cited as "Benner Aff." A true and correct copy of the Affidavit of Brittney Lacy, Esq. dated September 24, 2026, is attached as **Exhibit 6** and cited as "Lacy Aff."

Mr. Thompson has been on Florida's death row for nearly 50 years. *See Death Row Roster*, Fla. Dep't Corrs., https://pubapps.fdc.myflorida.com/OffenderSearch/deathrowroster.aspx (last visited Sept. 22, 2026). He is currently 74 years old (*id.*) and suffering from several severe medical conditions, including without limitation:

- Sepsis
- Acute systolic congestive heart failure (ejection fraction of 39%)
- Chronic kidney disease
- Severe fatty liver disease
- Acute pulmonary emboli in multiple lobes
- Deep vein thrombosis
- Multifocal pneumonia with a cavitary lung nodule concerning malignancy
- Severe protein-calorie malnutrition
- Multiple decubitus ulcers, including an end-stage (Stage 4) sacral ulcer
- Recent abdominal surgery requiring colostomy and ileostomy
- Refeeding syndrome requires twice-daily electrolyte monitoring
- Prolonged QTc interval (568 ms) placing him at risk of life-threatening cardiac arrhythmia
- Severe functional dependence (unable to sit upright, requires total assistance)
- Major neurocognitive disorder / dementia (MMSE score of 10/30)
- Anemia while on full-dose anticoagulation
- Rib fractures
- Fluid overload / anasarca

(*See generally* Zivot Aff.; Howard Aff.; Ouaou Aff.; Benner Aff.)

Mr. Thompson's medical decline has been progressing for years:

- **August 2024**: "Mr. Thompson was found to have a heart block known as a fascicular block indicating suspicion of an undiagnosed heart attack (myocardial infarction, MI)." (Howard Aff. 2.) An Echocardiogram

showed "his ejection fraction was only 45%. This confirmed the suspicion of Heart Failure." *Id.* Yet, Mr. Thompson was not seen by a cardiologist until "September 2025, over a year after original diagnosis." *Id.*

- **September 2024**: "Mr. Thompson was diagnosed with Heliobacter Pylori, the agent that causes stomach ulcers, and leads to stomach cancer." *Id.* He received treatment at that time. *Id.*
- **October 2025**: "Mr. Thompson was noted to have neurological changes . . . and was found to have a blood pressure of 99/51 (normal is 120/80), which did not change after several cups of water. He was sent out to the local hospital emergency room for treatment." *Id.*
- **December 2025:** "Mr. Thompson was seen in clinic for a painful left foot with cracking and bleeding skin which was diagnosed as a fungal infection of his foot, commonly referred to as 'athletes' foot.'" *Id.* "He was given medications to treat it." *Id.* However, by February 2026, Mr. Thompson's condition had "changed from a growth, and skin changes, to a painful discolored foot, and lower leg. The Triage nurse note indicated open sores, weeping, discoloration spreading up the leg. However, the Nurses note stated the right heel was purple seeping blood, continuing up the lower leg. Mr. Thompson could not bear weight on the foot and reported throbbing pain." *Id.* at 2-3

- **March 2026**: "Mr. Thompson complained of an upper body rash . . . . When examined by a nurse it was described as dead epidermis (skin) crusting with dry serum, blood and pus with scratch marks on his arms and chest. The nurse treated it with steroid cream and antibiotic ointment." *Id.* at 3. However, Dr. Howard opined that "[i]f it was as diffuse as noted, it is likely that an oral antibiotic was required." *Id.*
- **May 7, 2026**: Mr. Thompson "was seen in Chronic Care Clinic . . . by a Physician Assistant/Nurse Practitioner. It was noted that he had red lower legs, 'spider veins', pinpoint bleeding, bluish discoloration of the legs, a weeping rash and mild edema, pain, swelling and tenderness of both feet. He was diagnosed with cellulitis and started on Doxycycline and Bactrim antibiotics." *Id.* Dr. Howard opined that "[t]he description including the word 'bluish' may actually be a case of early gangrene, but there are no photos in the records to document clearly." *Id.*
- **June 10, 2026**: Mr. Thompson had a follow-up for his wounds. *Id.* "[T]he soles of his feet show[ed] a scaly surface but no open wounds." *Id.*

In August 2026, Mr. Thompson's health severely declined and continued into September 2026—just before Gov. DeSantis signed his death warrant:

- **August 4, 2026**: UCI received a request that he be evaluated "due to a recent fall and dementia." (Howard Aff. 3.) "[W]hile standing from a sitting position, [Mr. Thompson] fell to the floor. He sustained a bruise

to his left eye, and an abrasion of the right elbow. Except for an elevated blood pressure of 130/91, his vital signs were normal." *Id.* at 3.

- **August 5, 2026**: Mr. Thompson was seen in the Chronic Care Clinic and was "noted to have a mental status change. Specifically, the medical note stated he forgot his identification card, did not know who the president was, that he takes an inhaler, but none is prescribed." *Id.* The medical assessment also documented an unsteady gait and disorientation. (Benner Aff. ¶ 9.) It was further noted that Mr. Thompson had lost 20 pounds. (*Id.*; Howard Aff. 3.) A brain CT was suggested, but "no CT scan was ordered, and he was not sent out to the Emergency room to confirm the presence or absence of a brain bleed after his fall the day prior." (Howard Aff. 3.)
- **August 11, 2026**: FDOC ordered a wheelchair for Mr. Thompson because he was "unsteady when walking."
- **August 17, 2026**: Mr. Thompson was found unresponsive in his cell at UCI with a blood glucose level of 22 mg/dL and blood pressure of 55/31. An injury assessment noted "visible injuries" to Mr. Thompson's torso. (Howard Aff. 3.) "His blood sugar was 22 (normal is 70-110)." *Id.* Mr. Thompson was transported to an outside hospital, where he had the following diagnoses:
    - Hypoglycemia (low blood sugar);

- Acute systolic congestive heart failure;
- Anemia;
- Fatty Liver;
- A bleeding disorder due to Thrombocytopenia (low platelets, needed for clotting);
- Chronic Kidney Disease;
- Bilateral pedal edema (swollen legs);
- Left leg cellulitis;
- Multiple decubitus ulcers (bed sores from being in one position for an extended period);
- Hypertension;
- Severe malnutrition;
- Lactic acidosis (a chemical imbalance where lactic acid accumulates faster than it can be cleared by the body, indicating a serious underlying illness);
- Hemoperitoneum (blood inside the abdominal cavity);
- Multifocal pneumonia (located in more than one side of the lungs);
- Anasarca, and Ascites (free fluid in the muscle tissues and in the abdominal cavity); and
- Pleural and pericardial effusion (free fluid between the chest wall and lungs, as well as in the sac that contains the heart).

(Howard Aff. 3-4.)

- **August 17-September 3, 2026 (hospitalized)**: "An Echocardiogram showed an ejection fraction of 39% (normal is over 50%). . . . He was noted to have a previously performed (but poorly documented) colostomy. He was treated with intravenous antibiotics, and medications to correct his acidosis, and fluids. He also received several blood transfusions." (Howard Aff. 4.) Medical records report that Mr. Thompson "had deep wounds on his left buttock measuring 2X2 inches and on the right buttock measuring 3X3 inches. There was a small scab on his left heel, a

skin tear on his left upper back and his right leg above his ankle had cellulitis." *Id.* While at the hospital, Mr. Thompson underwent a diverting colostomy and developed intra-abdominal bleeding requiring transfusion. (Zivot Aff. ¶ 9.) The procedure also left several staples in his abdomen.

- **September 3, 2026**: While the State was transporting him back to UCI from the hospital, Mr. Thompson fell out of his wheelchair and sustained a scalp laceration, which required the transport van to divert to Lawtey Correctional Institution (another facility operated by FDOC), where Mr. Thompson received staples in his head. (Zivot Aff. ¶ 10; Ouaou Aff. 3; Howard Aff. 3.) He also had a "discolored" right forearm. (Howard Aff. 4.) On arrival at UCI, Mr. Thompson was again assessed by medical personnel, who found that his colostomy bag was unattached, and he (including his abdominal wounds) was covered in fecal matter. (Howard Aff. 4.) "The Injury assessment [further] indicates he was having difficulty breathing; his oxygen was 89% (Normal is over 95%) and he had scattered bruises on his arms." *Id.*
- **September 4-10, 2026 (hospitalized)**: Mr. Thompson was transported by ambulance to UF Health Shands Hospital ("**UF Health**"), where the emergency physician recorded his condition as "Critical." (Zivot Aff. ¶ 10;

Howard Aff. 4.) Upon arrival at UF Health, Mr. Thompson's diagnoses were:

- Hypotension (low blood pressure);
- Acute Pulmonary emboli (blood clots in the lungs);
- Right popliteal deep vein thrombosis (DVT) (clot in the leg vein near the knee);
- Pneumonia in the right lower lung lobe;
- Bilateral pleural effusions (fluid between the chest wall and lungs both sides);
- Cavitary pulmonary nodule in the right upper lung lobe (likely cancer or tuberculosis);
- Multiple intussusceptions without obstruction (infoldings of intestines upon themselves);
- Post operative hematoma (clot) in right lower abdominal quadrant;
- Severe malnutrition with 67-pound weight loss (29% decrease unintentionally) Now weighing 161 pounds;
- Severe muscle and fat wasting;
- Hypokalemia (low potassium, if low enough will stop the heart);
- Metabolic acidosis (not clearing acid in the body);
- Thrombocytosis (too many platelets);
- Anemia of chronic disease;
- Stage 4 Coccyx ulcers;
- Severe global deconditioning; and
- Impaired mobility and functional dependence.

(Howard Aff. 4; *see also* Zivot Aff. ¶¶ 10–12.)

- **September 8, 2026**: While at UF Health, Mr. Thompson's condition deteriorated, and he was moved to intensive care. (Zivot Aff. ¶¶ 11(a)–(f).)

- **September 10, 2026**: Mr. Thompson was discharged from UF Health. (Howard Aff. 4; Zivot Aff. ¶¶ 6, 11.) The UF Health case manager

recorded that an infirmary bed was needed because Mr. Thompson is "[o]n Eliquis," "[n]ot ambulatory," has a "[w]ound on coccyx," "[h]as 2 ostomies," and "is in need of electrolyte checks." (Benner Aff. ¶ 6; Zivot Aff. ¶ 13.). His discharge was predicated on continued care and UF Health's understanding that Mr. Thompson would be housed in a hospital setting. (Zivot Aff. ¶ 13.) UF Health's discharge instructions stated that Mr. Thompson would require (1) twice daily measuring of serum, phosphorous and magnesium, (2) blood counts to detect bleeding while anti-coagulated, (3) repeat electrocardiogram and close monitoring of the QTc intervals, (4) daily measurement of blood pressure, heart rate, temperature and weight, (5) blood glucose monitoring due to recent hypoglycemia, (6) medical nutrition therapy including protein supplements prescribed by Shands – Ensure three times daily and Juven two times daily, (7) pressure wound care, (8) ostomy care, surgical wound care and removal of staples, (9) physical therapy with Hoyer Lift and hospital bed to allow safe repositioning and transfer without injury, and (10) identification of a surrogate decision make. (Zivot Aff. ¶ 12.) UF Health also ordered a repeat CT scan in three months. (Howard Aff. 4.) The State returned Mr. Thompson to the UCI infirmary. *See id.* Upon admission to the infirmary, medical personnel noted "a full thickness sacral wound measuring 9X9 centimeters, (3.5X3.5 inches), a right scalp

stapled laceration and skin tear in the left upper chest approximately 2.5centimeters (1inch).” *Id.*

## II. Mr. Thompson’s Current Housing

On September 11—the day after Mr. Thompson was discharged from UF Health and taken back to the UCI infirmary—Gov. DeSantis signed Mr. Thompson’s death warrant, scheduling his execution for October 13. (Ex. 1.) At that time, the State transferred Mr. Thompson from the UCI infirmary to a non-medical death-watch cell at FSP.

Dr. Howard concluded that several of Mr. Thompson’s “diagnoses alone would dictate he requires a higher level of care than SHU or Death watch cells can provide and should at least be housed in the Infirmary.” (Howard Aff. 5.) His conditions, together, require a much higher level of care than FSP can provide. (Howard Aff. 5; Benner Aff. ¶ 14; Zivot Aff. ¶¶ 16–18.) His current conditions require around-the-clock monitoring and various follow-up tests. (Howard Aff. 5; Benner Aff. ¶ 14; Zivot Aff. ¶¶ 16–18.) Yet, Defendants continue housing Mr. Thompson in his death-watch, non-medical cell.

Further, although UF Health hospital administration had determined that Mr. Thompson “cannot be restrained at all due to medical mandate,” Defendants have handcuffed and shackled him while he’s been on death watch. (Ouaou Aff. 2-3.)

Mr. Thompson's current conditions and lack of adequate medical care are subjecting him to severe pain and mistreatment. (Ouaou Aff. 3; Lacy Aff. ¶¶ 9-10, 12.) He has reported a pain level of 7-8 on several occasions while at FSP on death watch. (Lacy Aff. ¶ 12.) And, as hospital notes indicate, Mr. Thompson cannot care for himself or even perform daily tasks. (*See* Ouaou Aff. 2-3.) He cannot even sit up straight on his own. (Ouaou Aff. 2.)

## III. Mr. Thompson's Prior Attempts at Obtaining Relief

Dr. Ouaou, who recently visited Mr. Thompson at FSP, opined that Mr. Thompson was in severe pain, was disoriented, and could not explain his medical condition. (Ouaou Aff. 2–3.) Dr. Benner opined that Mr. Thompson "may have suffered an acute cerebrovascular event with resultant vascular dementia or may be suffering from protracted delirium as a complication from his recent serious acute medical issues." (Benner Aff. ¶ 12.) Dr. Benner also opined that that "Mr. Thompson remains at elevated risk of cognitive impairment and delirium." *Id.* Dr. Benner also stated that she has "grave concerns that he would be unable to express concerning signs of clinical deterioration or distressing symptoms." *Id.* Further, Brittney Lacy, Esq., Mr. Thompson's long-time attorney who has had daily contact with him since the Governor signed his death warrant, opined that Mr. Thompson is unable to sit upright for sustained periods, has exhibited labored breathing and speech, and is confused about his location and whether he is receiving any medical care.

(Lacy Aff. ¶¶ 9–10, 12–13, 17–20.) Therefore, as a result of his physical and mental condition, Mr. Thompson is unable to submit a grievance to the State on his own. (Lacy Aff. ¶ 23; Benner Aff. ¶ 13.)

Nevertheless, on September 21, counsel for Mr. Thompson sent a letter to Warden Polk alerting him of the emergency of Mr. Thompson's condition and requesting immediate relief (attached as **Exhibit 7**, email attached as **Exhibit 8**). Later that day, after Warden Polk did not respond, Mr. Thompson's counsel sent a letter to FDOC (vis-à-vis General Counsel William Gwaltney) requesting immediate relief (email attached as **Exhibit 9**, letter attached as **Exhibit 10**).

The next afternoon, Attorney Gwaltney responded and stated that FDOC was "unable to share any specific information" about Mr. Thompson's care, questioned counsel's authority to act on Mr. Thompson's behalf, and forwarded the matter to Warden Polk. (Ex. 9.) That same day, Warden Polk responded and similarly refused to discuss Mr. Thompson's medical condition, stating he was "not able to provide any additional information." (Ex. 8.)

On September 22 at 7:10 p.m., counsel responded, confirmed their representation of Mr. Thompson, and again requested a response to the emergency grievance. (Ex. 9.) On September 23, Attorney Gwaltney replied that Mr. Thompson "is aware of and has access to the administrative procedures necessary to address the concerns you raise, if he chooses to do so.

As you know, your correspondence is not a substitute for those procedures, and without releases signed by Mr. Thompson, no one at FDC is allowed to provide you with any protected information." (Ex. 9.) To the contrary, as outlined above and confirmed by experts, Mr. Thompson's profound physical and cognitive incapacity render him wholly unable to submit a grievance on his own. (Lacy Aff. ¶ 23; Benner Aff. ¶ 13.)

As of the date of this filing, Mr. Thompson remains housed on death watch at FSP;[3] Defendants have not transported Mr. Thompson to an appropriate medical facility or otherwise responded to Mr. Thompson's undersigned counsel regarding Mr. Thompson's serious condition and required medical care.

**ARGUMENT**

To grant a TRO, this Court "need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Instead, the Court must determine that the plaintiff has shown "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would

[3] *See Inmate Population Information Detail*, Fla. Dep't Corrs., https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=053779&TypeSearch=AI (last visited Sept. 26, 2026) (indicating Mr. Thompson's currently housed at FSP).

inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Id.*[4]

Mr. Thompson satisfies each requirement: (I) Mr. Thompson is likely to prevail on the merits of his § 1983 claims because the State's deliberate indifference to his objective and serious medical conditions are clear and well-documented; (II) in the absence of an injunction, Mr. Thompson is suffering and will continue to suffer irreparable harm in the form of ongoing pain and suffering, and the risk of severe illness and sudden painful death due to the denial of adequate medical care; (III) the balance of equities favors Mr. Thompson; and (IV) the public interest favors the issuance of a TRO stopping Defendants' denial of adequate medical care to Mr. Thompson. Accordingly, this Court should grant this Motion and take immediate action to stop the Defendants' unconscionable (and unconstitutional) denial of adequate medical care to Mr. Thompson.

## I. Mr. Thompson is likely to succeed on the merits.

The State's deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). A prison official violates the Eighth Amendment when the medical deprivation is objectively serious, and the official knows of and disregards an excessive risk

---

[4] The standard for a preliminary injunction is the same. *Doe 1 v. Bondi*, 785 F. Supp. 3d 1268, 1281 (N.D. Ga. 2025).

to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

Here, Mr. Thompson has a substantial likelihood of success on the merits because Defendants' deliberate indifference to his objectively serious medical needs violates his Eighth Amendment rights. As several experts have opined, Mr. Thompson's conditions are objectively life-threatening. (*See generally* Zivot Aff.; Howard Aff.; Benner Aff.) Despite that, Defendants have acted with deliberate indifference by housing Mr. Thompson, who is experiencing either dementia or delirium, in a non-medical cell in a facility that cannot provide him with adequate care and thus denying him the care his condition requires. (*See generally* Zivot Aff.; Howard Aff.; Benner Aff.) Defendants have blatantly disregarded an excessive risk to Mr. Thompson's health or safety.

**A. Mr. Thompson has satisfied any exhaustion requirement.**

As outlined above, Mr. Thompson is unable to submit a grievance to the State. (Lacy Aff. ¶ 23; Benner Aff. ¶ 13.) Therefore, the State's administrative process is unavailable to Mr. Thompson. *See Ross v. Blake*, 578 U.S. 632, 642-43.

Notwithstanding, Mr. Thompson, through counsel, submitted an emergency grievance to FDOC to the designated parties identified in the Florida Administrative Code, which was met with a complete indifference to Mr. Thompson's medical needs, and a rejection of his grievance—as outlined

above. (*See* Exs. 7-10.) Accordingly, to the extent required, Mr. Thompson has exhausted any available administrative remedies, and his claims in this Court are ripe for review. At the least, such administrative remedies amount to a dead-end because Defendants have consistently proven, over the past two years, unwilling to provide Mr. Thompson with adequate medical care. *See id.* at 643.

**B. Mr. Thompson's conditions are objectively serious.**

Defendants cannot reasonably dispute that Mr. Thompson's medical conditions are "objectively serious." A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). In either situation, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834).

Mr. Thompson's documented diagnoses constitute a "serious medical need" that any layperson could identify—sepsis, acute pulmonary emboli, congestive heart failure, severe malnutrition, etc. And experts have confirmed the severity of Mr. Thompson's conditions. (*See* Howard Aff. 5. *See generally*

Zivot Aff.; Benner Aff.) Any one of these alone is "objectively serious," let alone the combination.

In fact, Defendants themselves recognize the severity of Mr. Thompson's condition. In the past six weeks, Defendants have taken Mr. Thompson to several outside facilities for treatment that could not be provided by Defendants and their facilities. (Benner Aff. ¶¶ 3-5; Zivot Aff. ¶ 10.) Even more, UF Health escalated Mr. Thompson's care to an intensive-care unit. (Zivot Aff. ¶ 11; Howard Aff. 5.). And, after he was discharged, the State housed Mr. Thompson in the infirmary at UCI.

It was only *after* the Governor signed his death warrant that Defendants unilaterally and unjustifiably decided that Mr. Thompson no longer deserves adequate medical care or that they are no longer required to provide such care (presumably because he is under death warrant) and transferred him to a non-medical cell at FSP, where the minimal medical care he is receiving is inconsistent with discharge orders and his serious condition. But the Governor issuing his death warrant does not erase Mr. Thompson's objectively serious and life-threatening medical conditions. Nor does it justify Defendants deliberate indifference in denying Mr. Thompson adequate medical care in the month between the Governor issuing his death warrant and his scheduled execution. So long as Mr. Thompson is housed by the State, the State's obligations to uphold the Constitution remain.

### C. Defendants Acted with Deliberate Indifference

Deliberate indifference requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837 (1994). A prisoner must show that prison officials "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) the disregard was by conduct that was more than mere negligence." *Keohane v. Sec'y, Fla. Dep't of Corrs.*, 952 F.3d 1257, 1266 (11th Cir. 2020). Even where some medical care is provided, "a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs." *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003).

Since Mr. Thompson's arrival at FSP on September 11, FDOC records do not document: (a) any laboratory tests; (b) any blood pressure, heart rate, temperature, weight, or blood glucose measurements, only oxygen saturation; (c) any physician examination (contact was limited to weekend telephone rounds with "no new orders"); (d) any nutritional supplementation or dietitian involvement despite severe malnutrition; (e) any physical or occupational therapy despite severe functional dependence; or (f) any follow-up on UF Health's discharge orders. (Zivot Aff. ¶ 14.)

Defendants prescribed furosemide at half the dose UF Health ordered, while nurses recorded persistent bilateral leg edema on nearly every shift. (Zivot Aff. ¶ 14(d).) Mr. Thompson's arrival paperwork affirmatively states "Does Inmate have Consults pending? No" and "Is the Inmate currently receiving healthcare? No." (Benner Aff. ¶ 8.) A physician exam on September 11 documented "no edema" and "no gait abnormalities"; yet, nursing notes the same day described 3+/4 edema in both legs and weakness. (Benner Aff. ¶ 8.).

FSP records from September 21 confirm that Mr. Thompson's condition is worsening under Defendants' insufficient care. His sacral ulcer wound had deteriorated, with "slough present," a "large amount of yellow discharge," and a "foul odor." That same day, FSP personnel noted that his colostomy appliance was "leaking." A chest x-ray showed "degenerative changes." Records from September 22 further noted generalized weakness that is "more pronounced in [his] lower extremities."

Despite all of this, FSP records report Mr. Thompson's pain scale as consistently at 0, that he is well-oriented, and that he has "no complaints." These entries are irreconcilable with the observations of Dr. Ouaou, Dr. Benner, Dr. Zivot, Dr. Howard, and Ms. Lacy, who have described Mr. Thompson as being in a declining medical condition, severe pain, disoriented, cognitively impaired, and unable to communicate his symptoms. (*See* Ouaou Aff. 2–3; Benner Aff. ¶¶ 9–10, 13; Zivot Aff. ¶¶ 16–18; Howard Aff. 5; Lacy Aff.

¶¶ 9–10, 12–13.) These notes are also inconsistent with the mere presentation of Mr. Thompson's several comorbidities, which present severe symptoms.

Defendants' deliberate indifference is clear. As Dr. Howard concluded, FDOC "has proven *by its own documentation* to be either unwilling or incapable of properly caring for Mr. Thompson's serious medical issues." (Howard Aff. 5 (emphasis added).)

## II. Without a TRO, Mr. Thompson will suffer irreparable harm.

Every hour Mr. Thompson remains without appropriate care, he faces an escalating cascade of life-threatening risks. Dr. Zivot identified the following: (a) cardiac arrhythmia and sudden death, his QTc interval is already critically prolonged at 568 ms, and refeeding syndrome causes rapid electrolyte shifts that, without twice-daily monitoring, can trigger fatal ventricular arrhythmias; (b) respiratory failure, severe hypophosphatemia weakens respiratory muscles in a man already compromised by pulmonary emboli, pleural effusions, pneumonia, rib fractures, and fluid overload; (c) undetected hemorrhage—full-dose anticoagulation with a hemoglobin of 8.4 g/dL, a postoperative hematoma, and a recent intra-abdominal hemorrhage carries a meaningful risk of bleeding that, without blood counts and vital signs, may not be recognized until he is in shock; (d) worsening fluid overload from an inadequate diuretic dose and no daily weights, risking further pulmonary congestion; (e) infection and sepsis—severe malnutrition impairs immunity

and wound healing, and his Stage 4 pressure injury without adequate offloading can progress to osteomyelitis and bloodstream infection; and (f) recurrent life-threatening hypoglycemia without glucose monitoring. (Zivot Aff. ¶¶ 16–17; *see also* Benner Aff. ¶¶ 13–14.)

Mr. Thompson's cognitive impairment, disorientation to time and place, and inability to identify the source of his own pain, means he cannot reliably report his own symptoms. During Dr. Ouaou's September 14 examination, Mr. Thompson was visibly writhing in pain yet could not identify where the pain was coming from, could not describe any of his recent medical problems, and did not recognize that he had been sentenced to death. (Ouaou Aff. 3.) Dr. Benner has expressed "grave concerns that he would be unable to express concerning signs of clinical deterioration or distressing symptoms," placing him "at high risk of untreated and unrecognized suffering as well as morbidity and mortality." (Benner Aff. ¶ 13.) Ms. Lacy, his long-time lawyer, expressed similar concerns. (Lacy Aff. ¶¶ 9-12.)

Therefore, Mr. Thompson's safety and well-being depends on objective medical monitoring that is not being provided. (Howard Aff. 5; Benner Aff. ¶ 13.) The irreparable harm Mr. Thompson is suffering is clear and continuing and cannot be undone or adequately compensated later by a monetary judgment.

## III. The balance of equities favors Mr. Thompson.

The Court must weigh "the competing claims of injury" and "consider the effect on each party of the granting or the withholding of the requested relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When the government is the party opposing the injunctive relief, the balance-of-the-harms and public-interest factors merge. *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

There is no legitimate argument by Defendants that the balance of equities weighs in favor of anything other than providing Mr. Thompson with adequate medical care by transporting him to an appropriate facility either within or outside the FDOC. The cost of transporting one prisoner to a hospital (which the State has already done on numerous occasions for Mr. Thompson) is nominal compared to the risk Mr. Thompson faces of serious harm and death.

Nor can Defendants argue that Mr. Thompson's pending death warrant somehow changes this calculus. Mr. Thompson, a frail, demented, 74-year-old man who cannot stand on his own, poses no more security risk now than he did three weeks ago when the State affirmatively sought outside hospital care for Mr. Thompson. Defendants' own medical records show that Mr. Thompson is bedridden and incapable of caring for himself. He, therefore, cannot

legitimately pose a security risk. And, importantly, Mr. Thompson is no less a human now than he was three weeks ago.

Accordingly, the balance of equities weighs heavily in Mr. Thompson's favor.

### IV. The public interest favors a TRO.

The public interest is served by constitutional prison administration and the humane treatment of persons in state custody. The Eighth Amendment exists to protect prisoners from exactly the kind of mistreatment and pain and suffering that Defendants are imposing on Mr. Thompson. *See Estelle*, 429 U.S. at 103–04. There is no public interest in allowing the State to deny a critically ill man the medical care he needs, as required by the U.S. Constitution.

## REASON FOR EMERGENCY AND *EX PARTE* RELIEF

Considering the exigent circumstances and the serious nature of the harm requested and Mr. Thompson's medical conditions, Mr. Thompson, through counsel, is filing this and requesting a ruling as quickly as possible. Mr. Thompson filed his Complaint in this case yesterday. (*See* ECF No. 1.) So far, none of the Defendants have been served or appeared, but counsel is working on that as quickly as possible. Plaintiff further requests that the Court set a hearing on a preliminary injunction within fourteen days of the TRO's entry pursuant to Rule 65(b)(2).

## SECURITY UNDER RULE 65(c)

Mr. Thompson is indigent (*see* ECF No. 5). The requested relief enforces his constitutional rights, and Defendants face no cognizable monetary loss from compliance. Therefore, Plaintiff requests that the Court waive the bond requirement or set nominal security under Rule 65(c). *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

## CONCLUSION

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an emergency *ex parte* temporary restraining order: (a) directing Defendants to immediately transport Mr. Thompson by medically appropriate means to a medical facility capable of providing the evaluation, monitoring, wound care, respiratory and cardiovascular support, infection treatment, pain management, and other care his conditions require; (b) barring Defendants from returning Mr. Thompson to a non-medical setting until qualified treating physicians determine that discharge is medically safe; and (c) waiving or setting nominal security under Rule 65(c). After opportunity for a hearing, Plaintiff requests that the Court enter a preliminary injunction with the same terms. Plaintiff requests such other relief as the Court deems appropriate.

Dated: September 26, 2026

Respectfully submitted,

QUARLES & BRADY LLP

/s/ *Melanie C. Verdecia*

Melanie C. Verdecia, Esq.
Bar No. 123855
101 E. Kennedy Blvd., #3400
Tampa, FL 33602
melanie.verdecia@quarles.com
Secondary Emails:
cyndi.trotti@quarles.com
docketFL@quarles.com

*and*

SAMUELS PARMER LAW, P.A.

/s/ *Marie-Louise Samuels Parmer*
Marie-Louise Samuels Parmer, Esq.
Bar No. 5584
PO Box 18988
Tampa, FL 33679
marie@samuelsparmerlaw.com
813-732-3321

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been filed with the Court through CM/ECF on September 26, 2026.

/s/ *Marie-Louise Samuels Parmer*
Marie-Louise Samuels Parmer, Esq.